# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ENVOLVE PHARMACY SOLUTIONS, INC., ET AL., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | C.A. No. N19C-12-214 PRW CCLD |
| RITE AID HEADQUARTERS CORP., and RITE AID CORP., | ) ) ) ) | |
| Defendants. | ) | |

Submitted: March 15, 2023
Decided: March 17, 2023

## MEMORANDUM OPINION AND ORDER

*Upon Defendants Rite Aid Headquarters Corp. and Rite Aid Corp.'s Motion for Summary Judgment,*
**DENIED,**

*Upon Plaintiffs Envolve Pharmacy Solutions, Inc., et al.'s Motion for Partial Summary Judgment,*
**DENIED.**

Karen Jacobs, Esquire, Alexandra M. Cumings, Esquire, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Keith J. Harrison, Esquire, Christopher Flynn, Esquire, Daniel W. Wolff, Esquire, Jerome P. DeSanto, Esquire, Jed Wulfekotte, Esquire, CROWELL & MORING LLP, Washington, D.C., *Attorneys for Plaintiffs Envolve Pharmacy Solutions, Inc., et al.*

Corinne Elise Amato, Esquire, Eric J. Juray, Esquire, Jason W. Rigby, Esquire, PRICKETT, JONES & ELLIOT, P.A., Wilmington, Delaware; Neil K. Gilman, Esquire, Christopher J. Dufek, Esquire, Brianne Reese, Esquire, HUNTON ANDREWS KURTH

LLP, Washington, D.C.; John B. Shely, Esquire, Courtney B. Glaser, Esquire, Kelsey J. Hope, Esquire, HUNTON ANDREWS KURTH LLP, Houston, Texas, *Attorneys for Defendants Rite Aid Headquarters Corp. and Rite Aid Corp.*

**WALLACE, J.**

Plaintiffs are a collective of health plans and pharmacy-benefit managers who entered into contracts with Defendant Rite Aid, a retail pharmacy. These contracts governed payments between the parties for prescription drug sales and reimbursements. Plaintiffs' remaining claims allege Defendants breached certain contracts and caused Plaintiffs to overpay Defendants.

Plaintiffs move for summary judgment on Count II (breach of contract between one Plaintiff and Defendants) and Count IV (breach of contract between one Plaintiff and Defendants). Defendants also move for summary judgment on Counts II and IV. Additionally, Defendants move for summary judgment on Count VI (unjust enrichment regarding two contracts between non-parties and Defendants). For the reasons below, Plaintiffs' Motion for Partial Summary Judgment is **DENIED**, and Defendants' Motion for Summary Judgment is **DENIED.**

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. THE PARTIES

Plaintiffs Centene Health Plans are subsidiaries of Centene Corporation.[1] Thirty-six entities named as Plaintiffs in this action fall under this umbrella term and are collectively referred to as Centene Health Plans.[2] Centene Health Plans are

---

[1] Amended Complaint ("Am. Compl.") ¶ 11, Mar. 8, 2022 (D.I. 107).

[2] *See id.* ¶ 11(a)-(jj).

"payors that offer both commercial and government-sponsored health plans, including pharmaceutical benefits products, to their customers."[3]

Plaintiffs Health Net Health Plans (collectively with Centene Health Plans, the "Health Plans") are subsidiaries of Centene Corporation.[4] Seven entities named as Plaintiffs in this action fall under this umbrella term and are collectively referred to as Health Net Health Plans.[5] Like Centene Health Plans, Health Net Health Plans are payors that offer health plans to their customers.[6]

Plaintiff Envolve Pharmacy Solutions, Inc. ("Envolve" and together with the Health Plans, "Centene Plaintiffs"), formerly known as US Script, Inc., is a subsidiary of Centene Corporation.[7] Envolve acted as a pharmacy-benefit manager ("PBM") for Centene Health Plans at all relevant times, and as a PBM for Health Net Health Plans beginning in March 2016.[8] Envolve is incorporated in Delaware; maintains corporate offices in Orlando, Florida and St. Louis, Missouri; and acted from Fresno, California for all events related to this action.[9]

---

[3]    *Id.* ¶ 11.

[4]    *Id.* ¶ 12.

[5]    *See id.* ¶ 12(a)-(g).

[6]    *Id.* ¶ 12.

[7]    *Id.* ¶ 14.

[8]    *See id.* ¶¶ 7, 14.

[9]    *Id.* ¶ 14.

On March 24, 2016, Centene Corporation acquired Health Net, Inc. and its affiliates, including Plaintiffs Health Net Health Plans and Health Net Pharmaceutical Services ("HNPS").[10] HNPS was a subsidiary of Centene Corporation from March 2016 until its dissolution in February 2021.[11] HNPS operated as a PBM for the Health Plans. HNPS was incorporated in California; maintained its corporate headquarters in San Rafael, California; and acted from San Rafael and Rancho Cordova, California for all events related to this action.[12]

Defendant Rite Aid Headquarters Corp. is a Delaware corporation and maintains its corporate headquarters in Camp Hill, Pennsylvania.[13] Defendant Rite Aid Corporation (collectively with Rite Aid Headquarters Corp., "Rite Aid") is Rite Aid Headquarters Corp.'s parent.[14] And Rite Aid Corporation is a Delaware corporation, too, maintaining its corporate headquarters in Camp Hill, Pennsylvania.[15] Rite Aid is one of the largest retail drugstore chains in the United States, with 2,510 retail locations as of February 2021.[16] In fiscal year 2021, Rite

---

[10] *Id.* ¶ 15.

[11] *Id.* ¶ 16.

[12] *Id.*

[13] *Id.* ¶ 18.

[14] *Id.*

[15] *Id.*

[16] *Id.* ¶ 20.

Aid dispensed over 164 million prescriptions and had operating revenues that exceeded $24 billion.[17]

## B. CONNECTIONS BETWEEN THE PARTIES: RITE AID, THE PBMS, AND THE HEALTH PLANS

Rite Aid is a "provider" in the pharmacy industry.[18] PBMs and health plans are "payors."[19] PBMs are intermediaries between pharmacies and other payors, such as health plans.[20] Centene Plaintiffs include the Health Plans and one of their PBMs, Envolve.[21]

Rite Aid had contracts with three relevant PBMs: Envolve, Caremark L.L.C. f/k/a PCS Health Systems ("Caremark"), and Argus Health Systems, Inc. ("Argus").[22] These contracts set reimbursement terms and rates.[23] The PBMs, namely Envolve, in turn, had separate contracts with the Health Plans that contained their own contracted terms and conditions.[24]

---

[17] *Id.*

[18] Defendants' (corrected) Motion for Summary Judgment ("Defs.' Mot. for Summ. J.") at 3, Dec. 22, 2022 (D.I. 231).

[19] *Id.*

[20] *Id.* (citing Am. Compl. ¶ 59).

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] *Id.*; *see also id.*, Ex. 25 at Tr. 112:20-113:13, Ex. 26 at Tr. 125:17-127:24.

Rite Aid is a Centene network pharmacy, which means Centene members can use their "Centene prescription drug benefit to fill their prescriptions at Rite Aid pharmacy locations."[25] When a Rite Aid pharmacy fills a prescription for a Centene member, Rite Aid "causes a claim for payment to be sent to Centene [Plaintiffs]."[26]

## C. AGREEMENTS BETWEEN RITE AID AND ENVOLVE, AND DEFINITIONS OF "USUAL AND CUSTOMARY" PRICE

### 1. The 2003 Contract between Rite Aid and Envolve

In 2003, Rite Aid and Envolve entered into a Pharmacy Participation Agreement (the "2003 Contract").[27] Centene Plaintiffs claim the "2003 Contract applied to prescription drug claims submitted by Rite Aid to Envolve for the damages period [of] September 2008 through April 30, 2013."[28] Under the 2003 Contract, Rite Aid filled drug prescriptions for Centene Health Plans members, then Rite Aid was reimbursed by Envolve.[29] There are two Sections directly relevant to Centene Plaintiffs' breach-of-contract claim under the 2003 Contract.[30] Section 1.7 defines "Usual and Customary Charges" ("U&C") as: "Those amounts which [Rite Aid] normally charges its private pay patients for comparable Pharmaceutical

---

[25] Am. Compl. ¶ 19.

[26] *Id.*

[27] *See* Centene Plaintiffs' Motion for Partial Summary Judgment ("Pls.' Mot. for Summ. J."), Dec. 20, 2022 (D.I. 228, D.I. 229), Ex. 1 (2003 Contract / Pharmacy Participation Agreement).

[28] *Id.* at 7.

[29] *Id.* at 7-8 (citing Plaintiffs' Exhibit 1).

[30] *See id.* (discussing Sections 2.5 and 1.7 of the 2003 Contract); *see id.* at 32-34 (same).

Services and as may be provided to Patient-Beneficiaries of a Third Party Payor, as provided herein."[31]  Section 2.5, titled "Claims Submission," states:

> [Rite Aid] agrees to file claims for payment via on-line communication immediately before dispensing of Pharmaceutical Products to Patient-Beneficiaries.  Under circumstances where on-line communication is not possible, [Rite Aid] agrees to file claims in writing for payment, using the industry standard Universal Claims Form, within 30 days of the date the service was provided, or earlier in accordance with the terms of an applicable Contract, which [Rite Aid] has accepted.[32]

At its core, the dispute over the 2003 Contract concerns a "lesser-of" logic formula;  the parties differ in their respective interpretations of this formula.  Centene Plaintiffs maintain the lesser-of logic means "a pharmacy is paid the 'lesser of' a negotiated rate or its U&C price for a drug" and that Rite Aid agreed to be reimbursed by PBMs pursuant to the lesser-of logic.[33]  Rite Aid posits that, under the 2003 Contract, the U&C price was not part of the lesser-of logic.[34]  Rite Aid says

---

[31]  *Id.*, Ex. 1 § 1.7.  "Patient-Beneficiaries" is defined, in relevant part, as: "Members and beneficiaries of members, who rely on a Third Party Payor . . . to purchase for them or reimburse them for the purchase of medical services or pharmaceutical products."  *Id.*, Ex. 1 § 1.4.  "Pharmaceutical Services" is defined, in relevant part, as:  "The providing by Pharmacy of drugs and professional services to Patient-Beneficiaries enrolled in Third Party Payor programs . . . .  Pharmaceutical Services includes the dispensing of any Generic Drug or Brand Name Drug, [among others]."  *Id.*, Ex. 1 § 1.5.  "Third Party Payor" is defined as:  "Any entity which purchases or reimburses the purchase of medical services or pharmaceutical products and services on behalf of Patient-Beneficiaries.  Such entities include, but are not limited to, insurance companies, union trusts, employers, medical care foundations, and preferred provider organizations."  *Id.*, Ex. 1 § 1.6.

[32]  *Id.*, Ex. 1 § 2.5.

[33]  Centene Plaintiffs' Answering Brief ("Pls.' Answering Br.") at 7, Jan. 24, 2023 (D.I. 243); *see also id.*, Ex. 5 at Tr. 206:6-9, 227:6-10, 271:7-12; Pls.' Mot. for Summ. J. at 7, Ex. 3 at Tr. 39:22-40:14.

[34]  Defendants' Answering Brief (Defs.' Answering Br.") at 7-8, Jan. 24, 2023 (D.I. 237).

Section 2.1 of the 2003 Contract covers the proper interpretation of "lesser-of" logic.[35] Section 2.1, titled "Terms," states:

> The following pricing applies to the On-Lok Third Party Payor only: Brand Name: AWP [Average Wholesale Price] less 12% or MAC [Maximum Allowable Cost], whichever is less, plus a $0.95 dispensing fee per 7-day supply. Generic: The lesser of AWP less 20% or MAC, whichever is less, plus a $0.95 dispensing fee per 7-day supply.[36]

The parties to the 2003 Contract amended Section 2.1 in 2007. The 2007 amendment changed the language: from "AWP less 12% or Mac" to "AWP less 15% or MAC" for "Brand Name"; from "AWP less 20% or MAC" to "AWP less 25% or MAC" for "Generic"; and from "plus a $0.95 dispensing fee" to "plus a $2.00 dispensing fee" for both "Brand Name" and "Generic."[37] Rite Aid maintains that the 2007 amendment also does not incorporate U&C price into the lesser-of logic.[38]

It appears that in June 2010, the 2003 Contract was amended again.[39] The 2010 amendment states in pertinent part that the "Generic Effective Rate" means:

> the overall rate of reimbursement for Covered Medications that are Generic Drugs (including MAC and non-MAC), expressed as a percentage reduction of the [AWP] as calculated quarterly including single source Generic Drug Claims, Usual and Customary Charge Claims, Zero Balance Claims, and multi-source Brand Name Drugs on

---

[35] *Id.*

[36] Pls.' Mot. for Summ. J., Ex. 1 § 2.1 (underlining in original); Defs.' Mot. for Summ. J., Ex. 26 at Tr. 32:21-33:6, 34:10-15; Defs.' Mot. for Summ. J., Ex. 25 at Tr. 94:15-95:2.

[37] Defs.' Answering Br., Ex. 3 § 2.1.

[38] *Id.* at 8 n.29.

[39] Plaintiffs' Reply Brief ("Pls.' Reply Br.") at 12, Feb. 13, 2023 (D.I. 265); *see also id.*, Ex. 8.

the MAC list or that price as Generic Drugs due to the DAW designation or that price as Usual and Customary Charge Claims.[40]

This language states that U&C price was to be included in AWP. AWP is part of Section 2.1's lesser-of logic in the 2003 Contract.[41]

### 2. The 2013 Contract between Rite Aid and Envolve

In 2013, Rite Aid and Envolve entered into a Participating Pharmacy Agreement (the "2013 Contract").[42] Centene Plaintiffs claim the "2013 Contract applied to prescription drug claims that Rite Aid submitted to Envolve for the damages period [of] May 1, 2013 through March 31, 2016."[43] Under the 2013 Contract, Rite Aid filled drug prescriptions for Centene Health Plans members, then Rite Aid was reimbursed by Envolve.[44] In the 2013 Contract, "Usual and Customary" price is defined as "the lowest price [Rite Aid] would charge to a non-contracted, cash-paying customer with no insurance for an identical Pharmaceutical Service on the date and at the location that the product is dispensed, inclusive of all applicable discounts, promotions, or other offers to attract customers."[45] The parties

---

[40] *Id.*, Ex. 8 § 6.

[41] *See* Pls.' Mot. for Summ. J., Ex. 1 § 2.1.

[42] *See id.*, Ex. 2 (2013 Contract / Participating Pharmacy Agreement).

[43] *Id.* at 9 (citing Plaintiffs' Exhibit 2).

[44] *Id.*

[45] *Id.*, Ex. 2 § 1(U).

agree that U&C price was included as a component of the lesser-of logic,[46] but they disagree over whether Rite Aid's Rx Savings Card Program (as explained further below) prices and price-matched prices (also explained further below) were incorporated into the 2013 Contract's U&C definition.[47] The 2013 Contract defines the lesser-of logic as:

> On Claims for an Extended Day Supply, [Rite Aid] agrees to accept the lesser of (i) the Usual and Customary price, (ii) the AWP discount and dispensing fee for the Extended Day Supply, and (iii) three (3) times the amount of the AWP discount and dispensing fee for the "Open Access (83 day supply or less)" network.[48]

Like with the 2003 Contract, Centene Plaintiffs believe Rite Aid failed to comply with sections in the 2013 Contract that covered claims processing and submissions.[49]

## D. RITE AID'S RX SAVINGS CARD PROGRAM AND PRICE-MATCHING POLICY

### 1. Rx Savings Card Program

In 2008, Rite Aid launched its Rx Savings Card Program (the "Program").[50]

---

[46] *See* Defs.' Answering Br. at 8 ("In the 2013 Contract, U&C is included as one component of Envolve's 'lesser of' logic when specified by the contract.").

[47] *See* Pls.' Mot. for Summ. J. at 35 ("The plain language . . . shows that the 2013 Contract did not permit Rite Aid to exclude its [Rite Aid Rx Savings Card Program] and price-matched prices from its U&C submission to Envolve."); Defs.' Answering Br. at 8 (noting that in the 2013 Contract "the U&C definition was also updated to reflect that the [Rite Aid Savings Card] Program was not U&C—as it had never been").

[48] Pls.' Mot. for Summ. J., Ex. 2 at Exhibit C-1 Fee Schedule.

[49] *See id.* at 35-38; *see also id.*, Ex. B § 4(C)-(D).

[50] *Id.* at 10, Ex. 13; Defs.' Answering Br. at 9.

The Program offered two types of discounts on generic and brand name drugs. First, the Program offered drugs on a national "flat fee list" at lower-than-usual prices.[51] Second, the Program offered "wrap" discounts for certain drugs, and these discounts were at times substantially lower than Rite Aid's retail price.[52] Rite Aid developed the Program in conjunction with ScriptSave.[53] The parties dispute the extent of ScriptSave's involvement in the Program. Centene Plaintiffs claim ScriptSave was "primarily responsible 'for just processing claims, billing, and reporting back to [Rite Aid].'"[54] Rite Aid maintains ScriptSave "administered the Program and adjudicated claims," and ScriptSave's "adjudication of the Program was essential to its operation."[55] This dispute is material because it goes to whether Rite Aid owned and controlled the Program. ScriptSave was replaced by EnvisionRx (now Elixir), which is a wholly-owned subsidiary of Rite Aid.[56]

The Program was available to anyone and there was no enrollment fee to become a participant in the Program.[57] To enroll in the Program, a person had to complete a form that contained demographic information, sign a HIPAA waiver, and

---

[51]  Pls.' Mot. for Summ. J. at 10-11, Ex. 11 at Tr. 28:3-29:1, Ex. 18.

[52]  *Id.* at 11, Ex. 11 at Tr. at 57:8-12, 67:19-68:10.

[53]  Defs.' Answering Br. at 9; Pls.' Mot. for Summ. J. at 11.

[54]  Pls.' Mot. for Summ. J. at 11 (quoting Pls.' Mot. for Summ. J., Ex. 21 at Tr. 19:22-20:3).

[55]  Defs.' Answering Br. at 9 (citing Defs.' Answering Br., Ex. 25 at 32:13-19).

[56]  Pls.' Mot. for Summ. J. at 12-13.

[57]  *Id.* at 13, Ex. 11 at Tr. 89:1-16.

sign a marketing authorization.[58]  The Program also permitted customers to enroll their family members without requiring the family member to sign the enrollment form.[59]

One question the parties' dispute is whether Program customers were "non-contracted, cash-paying" customers.  This is key to whether the prices paid by Program customers were encompassed by the contracts' U&C definitions and their respective lesser-of logics.  Centene Plaintiffs maintain Program customers were simply "cash customers" and back it up with certain testimony that the Program targeted uninsured and underinsured customers.[60]  Centene Plaintiffs also contend the Program was not a contract because there was no consideration given by the customers.[61]  Rite Aid maintains the prices charged to these customers were not part of the U&C's definition, and they point to the 2013 Contract definition of U&C that includes the language "non-contracted, cash paying customer," to conclude the Program customers were not covered by the definition.[62]  Specifically, Rite Aid

---

[58]  *Id.* at 13-14; *id.*, Ex. 11 at Tr. 95:11-18, 102:19-103:2, 104:15-105:3, 105:17-107:1.

[59]  *Id.* at 14, Ex. 11 at Tr. 102:3-10.

[60]  *See id.* at 14-15.

[61]  *Id.* at 37.

[62]  *See* Defs.' Answering Br. at 26-27; Defs.' Mot. for Summ. J. at 34.

contends the customers did provide consideration (*i.e.*, their personal information and optional marketing authorization) to enroll in the Program.[63]

### 2. Price-Matching Policy

From 2008 to 2015, Rite Aid had a price-matching policy that allowed pharmacists to match a competitor's price.[64] Customers would provide a Rite Aid pharmacist with a competitor's verified price (subject to geographical limitations).[65] This policy allowed Rite Aid to compete with other pharmacies offering lower prices, like Walmart's $4 generic drugs program.[66]

Like with the Program, the price-matching policy is relevant to whether the matched prices were part of Rite Aid's U&C. Centene Plaintiffs seemingly contend the matched prices fall within the definition of U&C,[67] and Rite Aid contends these matched prices don't.[68]

### E. AGREEMENT BETWEEN RITE AID AND CAREMARK

In 1996, Rite Aid and PBM Caremark entered into a "Provider Agreement" (the "Caremark Contract").[69] The Caremark Contract applied to prescription drugs

---

[63] *See* Defs.' Answering Br. at 39-40.

[64] *Id.* at 12; Pls.' Mot. for Summ. J. at 16.

[65] Pls.' Mot. for Summ. J. at 16-17; Defs.' Answering Br. at 12.

[66] Pls.' Mot. for Summ. J. at 17.

[67] *See* Pls.' Answering Br. at 3-4; Pls.' Mot. for Summ. J. at 16-19.

[68] *See* Defs.' Answering Br. at 12-13.

[69] *See* Defs.' Mot. for Summ. J., Ex. 1 (Caremark Contract).

purchased by members of the Health Plans.[70]  Health Net Health Plans reimbursed Rite Aid through PBM Caremark for the period of September 1, 2008, through December 23, 2019.[71]  Centene Health Plans reimbursed Rite Aid through PBM Caremark on a rolling basis for the period of September 1, 2016, through December 23, 2019.[72]

Under the Caremark Contract, U&C price is defined as "the lowest price [Rite Aid] would charge to a particular customer if such customer were paying cash for an identical prescription on that particular day.  This price must include any applicable discounts offered to attract customers."[73]  In 2019, Rite Aid and Caremark amended the definition of U&C price.  The amended definition states U&C price "shall exclude third party cash discount card networks and/or other discount programs that require program enrollment."[74]  Caremark reimbursed Rite Aid using lesser-of logic for prescription drugs sold to members of the Health Plans.[75]  The Health Plans funded Rite Aid's reimbursements.[76]

---

[70]  Pls.' Answering Br. at 9, Ex. 5 at Tr. 220:2-19.

[71]  *Id.* at 8, Ex. 36 ¶ 11.

[72]  *Id.* at 8, Ex. 36 ¶ 13.

[73]  Defs.' Mot. for Summ. J., Ex. 1 at Schedule of Terms.

[74]  *Id.*, Ex. 18 § 13(f).

[75]  Pls.' Answering Br. at 9, Ex. 5 at Tr. 227:6-10.

[76]  *Id.* at 9-10, Ex. 5 at Tr. 220:14-19.

## F. Agreement between Rite Aid and Argus

In 2010, Rite Aid and PBM Argus entered into a "Participating Agreement for Pharmacy" (the "Argus Contract").[77] The Argus Contract applied to prescription drugs purchased by members of Argus Centene Plans.[78] Argus Centene Plans reimbursed Rite Aid through PBM Argus from May 1, 2013, through December 31, 2017.[79]

Under the Argus Contract, U&C price is defined as "the lowest price [Rite Aid] would charge to a cash paying, **non-contracted** customer for an identical prescription on the date and at the location that the prescription is dispensed, including any special promotions or discounts available to the public on such date of dispensing."[80] In 2018, Rite Aid and Argus amended the definition of U&C price. The amended definition states that U&C price "shall exclude cash discount card networks and/or other discount programs that require enrollment."[81] It appears undisputed that Argus reimbursed Rite Aid using a lesser-of logic for prescription

---

[77]  Defs.' Mot. for Summ. J., Ex. 5 (Argus Contract).

[78]  Pls.' Answering Br. at 10; Defs.' Mot. for Summ. J., Ex. 5 § 3.

[79]  Pls.' Answering Br. at 10, Ex. 36 ¶ 14.

[80]  Defs.' Mot. for Summ. J., Ex. 5 at Ex. 1 § 1.40 (emphasis in original).

[81]  Pls.' Answering Br., Ex. 13 § 4(b).

drugs sold to members of Argus Centene Plans.[82] Argus Centene Plans funded Rite Aid's reimbursements.[83]

## G. PROCEDURAL HISTORY

On December 23, 2019, Centene Plaintiffs filed their original complaint in this action and asserted six causes of action: (1) fraud and intentional misrepresentation (by Centene Plaintiffs and against Rite Aid), (2) breach of the 2003 Contract between Rite Aid and Envolve, (3) breach of the 2003 Contract— third party beneficiary (by Centene Health Plans and against Rite Aid), (4) breach of the 2013 Contract between Rite Aid and Envolve, (5) breach of the 2013 Contract—third party beneficiary (by Centene Health Plans and against Rite Aid), and (6) unjust enrichment (by Centene Plaintiffs and against Rite Aid).[84] Earlier, Rite Aid filed a motion to dismiss the complaint invoking statute of limitations, failure to state a claim, and the voluntary payment doctrine.[85] The Court issued an earlier opinion on that motion to dismiss.[86] Therein, the Court dismissed the fraud claim (Count I), and the third party beneficiaries breach-of-contract claims (Counts

---

[82] *See id.* at 11 ("There is no evidence that Argus reimbursed Rite Aid using any methodology other than lesser-of U&C logic for prescriptions administered to members of Argus Centene Plans.").

[83] *Id.*

[84] *See* Complaint ¶¶ 70-137, Dec. 23, 2019 (D.I. 1).

[85] *See* Defendants' Motion to Dismiss, Feb. 28, 2020 (D.I. 28, D.I. 29).

[86] Memorandum Opinion ("Mem. Op."), Jan. 15, 2021 (D.I. 62).

III and V).[87]  The Court denied the motion to dismiss Envolve's breach-of-contract claims (Counts II and IV), and "the remaining Centene [Plaintiffs'] (excluding Envolve) claim for unjust enrichment" (Count VI).[88]  Additionally, the Court held the statute of limitations argument was fact-specific and unresolvable at motion to dismiss stage; the Court found the voluntary payment doctrine did not bar the Centene Plaintiffs' claims.[89]

Thereafter, Centene Plaintiffs filed their Amended Complaint.[90]  The Amended Complaint asserts three causes of action: (1) breach of the 2003 Contract between Rite Aid and Envolve (Count II), (2) breach of the 2013 Contract between Rite Aid and Envolve (Count IV), and (3) unjust enrichment brought by non-Envolve Plaintiffs against Rite Aid (Count VI).[91]

Rite Aid has filed its instant summary judgment motion on all remaining claims.[92]  Simultaneously, Centene Plaintiffs a summary judgment motion on Counts II and IV.[93]  Thus, the parties have filed cross-motions for summary judgment on Counts II and IV.  During these summary judgment proceedings, Centene Plaintiffs

---

[87]  *See id.* at 31.

[88]  *See id.*

[89]  *See id.* at 18-21, 29-30.

[90]  *See* Am. Compl.

[91]  *See id.* ¶¶ 99-106, 122-29, 145-49.

[92]  *See* Defs.' Mot. for Summ. J.

[93]  *See* Pls.' Mot. for Summ. J.

have also filed two Motions to Strike Rite Aid's summary judgment exhibits—one aimed at a deposition, and one targeting an affidavit.[94]  The Court here disposes of all these motions.

## II.  STANDARD OF REVIEW

### A. SUMMARY JUDGMENT STANDARD

"Summary judgment is appropriate where the record demonstrates that 'there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"[95]  The Court's function when deciding a motion for summary judgment is to determine whether genuine issues of material fact exist, "but not to decide such issues."[96]  Summary judgment "will not be granted if 'a material fact is in dispute' or 'it seems desirable to inquire thoroughly into [the facts] to clarify the application of the law to the circumstances.'"[97]  Initially, the movant bears the burden of demonstrating its motion is supported by undisputed material facts.[98]  If the movant succeeds in that, the burden shifts to the non-movant to

---

[94]  *See* D.I. 235, D.I. 236.

[95]  *Parexel Int'l (IRL) Ltd. v. Xynomic Pharms., Inc.*, 2020 WL 5202083, at *4 (Del. Super. Ct. Sept. 1, 2020) (quoting Del. Super. Ct. Civ. R. 56(c)).

[96]  *Merrill v. Crothall-American Inc.*, 606 A.2d 96, 99 (Del. 1992) (citation omitted); *see also Oliver B. Cannon & Sons, Inc. v. Dorr-Oliver Inc.*, 312 A.2d 322, 325 (Del. Super. Ct. 1973).

[97]  *Unbound P'rs Ltd. P'ship v. Invoy Hldgs. Inc.*, 251 A.3d 1016, 1024 (Del. Super. Ct. 2021) (alteration in original) (quoting *Ebersole v. Lowengrub*, 180 A.2d 467, 468-69 (Del. 1962)).

[98]  *Moore v. Sizemore*, 405 A.2d 679, 680 (Del. 1979) (citation omitted).

demonstrate there is a "genuine issue for trial."[99] The Court construes the record in the light most favorable to the non-movant to determine whether there is a genuine issue for trial.[100]

"These well-established standards and rules equally apply [where] the parties have filed cross-motions for summary judgment."[101] "[W]here cross-motions for summary judgment are filed and neither party argues the existence of a genuine issue of material fact, 'the Court shall deem the motions to be the equivalent of a stipulation for decision on the merits based on the record submitted with the[m].'"[102] Even so, "the existence of cross motions for summary judgment does not act *per se* as a concession that there is an absence of factual issues."[103] In other words, "the [C]ourt is not relieved of its obligation to deny summary judgment if a material factual dispute exists."[104] To determine whether a genuine issue of material fact exists, the Court evaluates each motion separately.[105] The Court will deny summary

---

[99] Del. Super. Ct. Civ. R. 56(e).

[100] *Judah v. Del. Tr. Co.*, 378 A.2d 624, 632 (Del. 1977) (citation omitted).

[101] *IDT Corp. v. U.S. Specialty Ins. Co.*, 2019 WL 413692, at *5 (Del. Super. Ct. Jan. 31, 2019) (citations omitted); *see Capano v. Lockwood*, 2013 WL 2724634, at *2 (Del. Super. Ct. May 31, 2013) (citing *Total Care Physicians, P.A. v. O'Hara*, 798 A.2d 1043, 1050 (Del. Super. Ct. 2001)).

[102] *Radulski v. Liberty Mutual Fire Ins. Co.*, 2020 WL 8676027, at *4 (Del. Super. Ct. Oct. 28, 2020) (alteration in original) (quoting Del. Super. Ct. Civ. R. 56(h)).

[103] *United Vanguard Fund, Inc v. TakeCare, Inc.*, 693 A.2d 1076, 1079 (Del. 1997).

[104] *Fasciana v. Elec. Data Sys. Corp.*, 829 A.2d 160, 166 (Del. Ch. 2003).

[105] *See Empire of Am. Relocation Servs., Inc. v. Com. Credit Co.*, 551 A.2d 433, 435 (Del. 1988) ("It is imperative that the court consider whether there is a genuine issue of material fact each time [summary judgment] motions are presented." (citation omitted)).

judgment if "it is not reasonably certain that there is no triable issue" of fact.[106]  And while "summary judgment is encouraged when possible, there is no absolute right to summary judgment."[107]  In the end, summary judgment "must be denied if there is any reasonable hypothesis by which the opposing party may recover, or if there is a dispute as to a material fact or the inferences to be drawn therefrom."[108]

## III.  PARTIES' CONTENTIONS

Centene Plaintiffs moved for summary judgment on their breach-of-contract claims under the 2003 and 2013 Contracts (Counts II and IV).  Centene Plaintiffs contend the U&C price definitions in the Contracts include cash discounts Rite Aid provided to its customers unless the parties agreed to exclude them, which Centene Plaintiffs say didn't happen.[109]  Centene Plaintiffs also contend Rite Aid is collaterally estopped from relitigating whether its Program customers were "cash

[106] *Unbound Partners*, 251 A.3d at 1024 (internal quotation marks omitted); *see Cont'l Ins. Co. v. Rutledge & Co., Inc.*, 750 A.2d 1219, 1227–28 (Del. Ch. 2000) ("[T]he Court [] maintains the discretion to deny summary judgment if it decides a more thorough development of the record would clarify the law or its application." (citing *Alexander Indus., Inc. v. Hill*, 211 A.2d 917, 918–19 (Del. 1965))); *cf. Jeffries v. Kent Cty. Vocational Tech. Sch. Dist. Bd. of Educ.*, 743 A.2d 675, 677 (Del. Super. Ct. 1999) ("[A] matter should be disposed of by summary judgment whenever an *issue of law is involved* and a trial is unnecessary." (emphasis added) (citing *State ex rel. Mitchell v. Wolcott*, 83 A.2d 759, 761 (Del. 1951))); *see also Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P.*, 794 A.2d 1141, 1150 (Del. 2002) ("The trial court may deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial." (cleaned up)).

[107] *AeroGlobal Cap. Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 443 (Del. 2005) (citation omitted).

[108] *Vanaman v. Milford Mem'l Hosp., Inc.*, 272 A.2d 718, 720 (Del. 1970).

[109] *See* Pls.' Mot. for Summ. J. at 23-29.

customers" because, in their eyes, the issue was previously litigated.[110] Centene Plaintiffs take the two above contentions and conclude that Rite Aid's failure to incorporate its discounted and other prices into the U&C price caused Rite Aid to breach both the 2003 Contract and the 2013 Contract, entitling Centene Plaintiffs to money damages for overpayments made to Rite Aid.[111]

Rite Aid moved for summary judgment on the two contract claims and the unjust enrichment claim (Counts II, IV, and VI). Rite Aid contends Delaware's three-year statute of limitations for contract claims bars all of Centene Plaintiffs' remaining claims.[112] Next, Rite Aid insists it fully complied with the contracts at issue—the 2003 Contract, the 2013 Contract, the Caremark Contract, and the Argus Contract.[113] Rite Aid says that neither the Caremark Contract nor the Argus Contract encompassed Program prices or price-matched prices as part of the U&C price.[114] Rite Aid challenges Centene Plaintiffs have no evidence Rite Aid breached Envolve's 2003 or 2013 Contracts, or that Rite Aid was overpaid.[115] Rite Aid also

---

[110] *See id.* at 29-31.

[111] *See id.* at 31-39.

[112] *See* Defs.' Mot. for Summ. J. at 12-25.

[113] *See id.* at 25-36.

[114] *See id.* at 26-31; *see also* Defs.' Answering Br. at 12-13.

[115] *See* Defs.' Mot. for Summ. J. at 31-36.

contends Centene Plaintiffs cannot prove damages,[116] and that the voluntary payment doctrine defeats all of Centene Plaintiffs' claims.[117]

## IV.  DISCUSSION

### A. RITE AID IS NOT ENTITLED TO SUMMARY JUDGMENT ON STATUTE OF LIMITATIONS.

Rite Aid posits Delaware's three-year statute of limitations bars Centene Plaintiffs' claims to the extent those claims accrued before December 23, 2016.[118] Specifically, Rite Aid argues the claims are based on the Program prices, which launched over a decade before this action commenced.[119]  Rite Aid also points out price-matching ended in 2015.[120]  And, says Rite Aid, no exception to the statute of limitations applies.[121]  Centene Plaintiffs deploy four counterarguments.  First, Centene Plaintiffs say a federal class action, captioned as *Josten v. Rite Aid Corp.* (C.A. No. 3:18-cv-00152 (S.D. Cal.)) tolled the statute of limitations in this action.[122] Second, Centene Plaintiffs say the "inherently unknowable doctrine" tolled the statute of limitations starting in September 2008 when Rite Aid began the

---

[116] *See id.* at 36-39.

[117] *See id.* at 39-41.

[118] *Id.* at 12.

[119] *Id.*

[120] Defs.' Answering Br. at 12-13.

[121] Defs.' Mot. for Summ. J. at 12.

[122] Pls.' Answering Br. at 14-15.

Program.[123]  Third, Centene Plaintiffs contend the fraudulent concealment doctrine tolled the statute of limitations starting in September 2008.[124]  Fourth, Centene Plaintiffs maintain they "were not on inquiry notice of Rite Aid's wrongful acts more than three years before bringing this suit, let alone more than three years before *Josten* was filed."[125]

In Delaware, contract claims are subject to a three-year statute of limitations.[126]  And those claims must be brought within three years "from the date that the cause of action accrued."[127]  A breach-of-contract claim accrues "at the time the contract is broken, not at the time when the actual damage results or is ascertained."[128]  Stated differently, "the statute is triggered as soon as the breach occurs, even if the aggrieved plaintiff is ignorant of the breach."[129]  When a claim falls outside the limitations period on its face, "the plaintiff bears the burden of

---

[123]  *Id.* at 16-17.

[124]  *Id.* at 19-20.

[125]  *Id.* at 20.

[126]  *See* DEL. CODE ANN. tit. 10, § 8106(a).

[127]  *Levy v. Brownstone Asset Mgmt., LP*, 76 A.3d 764, 768 (Del. 2013) (citation omitted).

[128]  *Worrel v. Farmers Bank of State of Del.*, 430 A.2d 469, 472 (Del. 1981) (internal quotation marks and citation omitted).

[129]  *Intermec IP Corp. v. TransCore, LP*, 2021 WL 3620435, at *21 (Del. Super. Ct. Aug. 16, 2021) (citing *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 319 (Del. 2004)); *see also SmithKline Beecham Pharms. Co. v. Merck & Co., Inc.*, 766 A.2d 442, 450 (Del. 2000) (observing that Delaware's contractual statute of limitations "is not a discovery statute" and so, absent tolling, constructive knowledge of the breach is enough to trigger the statutory period (internal quotations marks omitted)).

pleading facts leading to a reasonable inference that a tolling exception applies."[130]

"Ignorance of the cause of action will not toll the statute, absent concealment or fraud, or unless the injury is inherently unknowable and the claimant is blamelessly ignorant of the wrongful act and the injury complained of."[131]

Rite Aid, as the movant, must prove the evidence supports the conclusion that the limitations period has lapsed.[132] If Rite Aid meets its burden, the burden shifts to Centene Plaintiffs to demonstrate that circumstances exist to justify tolling.[133] There is no dispute the claims accrued, *i.e.*, the alleged breaches occurred, more than three years before this action was filed.[134] As such, Centene Plaintiffs must demonstrate an exception applies to toll the running of the limitations period.

This action was filed on December 23, 2019. Thus, claims that accrued before December 23, 2016, are barred unless an exception applies. Centene Plaintiffs have carried their burden to show a genuine issue of material fact exists over whether an exception to toll the limitations period applies, specifically as it relates to the

---

[130] *Intermec IP Corp.*, 2021 WL 3620435, at *21 (citation omitted).

[131] *Coleman v. Pricewaterhousecoopers, LLC*, 854 A.2d 838, 842 (Del. 2004) (citation omitted).

[132] *See id.* at 843 (holding that the lower court erred in granting summary judgment on the statute of limitations when genuine issues of material fact existed regarding the plaintiff's notice of the wrongful acts leading to the cause of action).

[133] *Ins. Co. of N. Am. V. NVF Co.*, 2000 WL 305338, at *2 (Del. Super. Ct. Jan. 20, 2000) (citing *U.S. Cellular Inv. Co. of Allentown v. Bell Atl. Mobile Sys. Inc.*, 677 A.2d 497 (Del. 1996)).

[134] *See* Pls.' Answering Br. at 14-24 (arguing four exceptions justify tolling the statute of limitations, but not that the action was commenced within three years of any breach).

"inherently unknowable doctrine." Under this doctrine, the statute of limitations begins to run "upon the discovery of facts constituting the basis of the cause of action *or* the existence of facts sufficient to put a person of ordinary intelligence and prudence on inquiry which if pursued, would lead to the discovery of such facts."[135]

Centene Plaintiffs maintain their injury caused by the exclusion of discount prices was "inherently unknowable until 2017" when they became aware of a "whistleblower lawsuit" claiming Rite Aid inflated its U&C prices.[136] Moreover, Centene Plaintiffs state that the injury was not reasonably knowable until 2017 because Rite Aid set its U&C price and did not share how it formulated that price.[137] Centene Plaintiffs contend that as a result of the confidential nature of Rite Aid's pricing formula, they had no way to know Rite Aid did not include its Program prices in its U&C price until the 2017 whistleblower lawsuit.[138]

---

[135] *See Coleman*, 854 A.2d at 842 (emphasis in original) (internal quotation marks and citation omitted).

[136] *See* Pls.' Answering Br. at 17; Defs.' Mot. for Summ. J., Ex. 19 at 10-11(Q: "Identify the date each Plaintiff became aware and describe how each Plaintiff became aware of Defendants' purported 'scheme' alleged in paragraphs 44 and 45 of the Complaint." A: "[I]n 2017, based upon information in public litigation and government investigations of which it became aware, [Plaintiffs] began to suspect Rite Aid was falsely reporting its U&C charges to [Plaintiffs], resulting in potential overcharges for prescription drug reimbursement claims."). *Compare* Complaint ¶¶ 44-45, *with* Am. Compl. ¶¶ 56-57.

[137] *See* Pls.' Answering Br. at 17-18. Rite Aid's counsel stated in a February 2019 letter to Envolve that Rite Aid's "proprietary pricing algorithm" involved "highly confidential information." *See id.*, Ex. 21 at 2.

[138] *See id.* at 17-18.

Rite Aid, at bottom, argues Centene Plaintiffs were on notice and/or knew Program prices and price-matched prices were not incorporated into U&C more than three years before Centene Plaintiffs commenced this action.[139]

In support thereof, Rite Aid has latched onto a 2010 email between an Envolve employee and HEB, a regional grocery chain based in Texas.[140] HEB, like Rite Aid, was a Centene Corporation vendor.[141] The 2010 email between that Envolve employee and HEB stated that HEB did not include any discounts or special program pricing as part of its U&C price.[142] Rite Aid contends this is enough to put Centene Plaintiffs on inquiry notice, or at least that Centene Plaintiffs were required to investigate further after they received this information.[143] Centene Plaintiffs counter that other stores, like Walmart, did include discount prices in its U&C metric.[144]

The standard here is whether Centene Plaintiffs were aware of facts, more than three years before this action commenced, that constitute "the basis of the cause of action *or* the existence of facts sufficient to put a person of ordinary intelligence and prudence on inquiry which if pursued, would lead to the discovery of such

---

[139] *See* Defendants' Reply Brief ("Defs.' Reply Br.") at 1-6, Feb. 13, 2023 (D.I. 264).

[140] *See* Defs.' Mot. for Summ. J. at 17-19; Pls.' Answering Br. at 22; Defs.' Reply Br. at 2-3.

[141] Defs.' Mot. for Summ. J., Ex. 25 at Tr. 55:19-56:14.

[142] *See id.*, Ex. 25 at Tr. 58:10-21.

[143] Defs.' Reply Br. at 2-3.

[144] *See* Pls.' Answering Br. at 20-21.

facts."[145] Even "[a]ssuming without deciding that [Centene Plaintiffs] were on inquiry notice, it cannot be determined, on the present record, whether a diligent inquiry by [Centene Plaintiffs] would have uncovered facts sufficient for them to assert" their breach-of-contract claims.[146]

Rite Aid also contends it clarified the U&C definition in the 2013 Contract. Specifically, Rite Aid argues the 2013 Contract addressed the Program, and the term "non-contracted" in the 2013 Contract U&C definition proves this.[147] Rite Aid cites testimony from its own witness to support this "understanding," but no Centene Plaintiffs' witness. This is not enough; there remains a genuine issue of material fact. Whether Centene Plaintiffs were on inquiry notice, and, if they were, whether a diligent inquiry would've uncovered facts sufficient to assert their claims, is a disputed question of fact that "preclude[s] a determination *as a matter of law*."[148]

---

[145] *See Coleman*, 854 A.2d at 842 (emphasis in original) (internal quotation marks and citation omitted).

[146] *See id.* at 843.

[147] Defs.' Reply Br. at 4-5 (citing Defs.' Mot. for Summ. J. at 33-36).

[148] *Coleman*, 854 A.2d at 843 (emphasis in original). Rite Aid additionally argues the statute of limitations bars Centene Plaintiffs' claim for unjust enrichment under the Caremark Contract. *See* Defs.' Mot. for Summ. J. at 28-29. In July 2011, Caremark announced a change to its U&C definition for its Federal Employee Program ("FEP"). *See* Defs.' Mot. for Summ. J., Ex. 6. Rite Aid says this put Centene Plaintiffs on inquiry notice that Program prices were not part of U&C. Defs.' Mot. for Summ. J. at 28-29. Again, this is not enough. The FEP plan is entirely distinct from the contracts at issue in this case. And the FEP announcement gives no indication that Program prices were never part of U&C for other Caremark contracts. *See* Defs.' Mot. for Summ. J., Ex. 6. As such, the statute of limitations does not bar Centene Plaintiffs' Caremark Contract unjust enrichment claim.

## B. RITE AID IS NOT COLLATERALLY ESTOPPED FROM LITIGATING WHETHER PROGRAM CUSTOMERS ARE "CASH" CUSTOMERS.

Centene Plaintiffs contend collateral estoppel bars Rite Aid from relitigating whether its Program customers were "cash" customers. Centene Plaintiffs point to an arbitration between Humana Health Plan, Inc., and Rite Aid (the "Humana Arbitration").[149] On April 22, 2022, an arbitrator issued an award for Humana over a breach-of-contract claim by Humana and against Rite Aid.[150] The arbitration decision discussed the scope of "cash" customers in participating pharmacy agreements.[151] The contracts at issue in that decision did not define U&C price.[152] Rite Aid argues, *inter alia*, the fact that the contracts at issue in the Humana Arbitration were not the same as those here precludes Centene Plaintiffs' collateral estoppel argument.[153]

> To determine whether collateral estoppel applies to bar consideration of an issue, a court must determine whether: (1) The issue previously decided is *identical* with the one presented in the action in question, (2) the prior action has been finally adjudicated on the merits, (3) the party against whom the doctrine is invoked was a party or in privity with a party to the prior adjudication, and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.[154]

---

[149] *See* Pls.' Mot. for Summ. J., Ex. 40 (Humana Arbitration decision).

[150] *See id.*, Ex. 40 at 49.

[151] *See id.*, Ex. 40 at 21-22.

[152] *Id.*, Ex. 40 at 12.

[153] *See* Defs.' Answering Br. at 23-24.

[154] *Betts v. Townsends, Inc.*, 765 A.2d 531, 535 (Del. 2000) (emphasis added) (citations omitted).

"Arbitration is included among the 'prior actions'" that might trigger collateral estoppel.[155]  And trial courts have "broad discretion" to determine whether collateral estoppel should apply in a given instance.[156]

Collateral estoppel does not apply to this action.  The contracts at issue in the Humana Arbitration did not define U&C price.  This caused the arbitrator to look outside the four corners for those contracts.  The contracts here expressly define U&C price.  A central issue in this case is whether Rite Aid's Program and price-match customers were "cash" customers, and whether Program and price-matched prices should have been included in the U&C price.  No doubt, the requisite analyses between the Humana Arbitration and this case differ.  In other words, the "issue previously decided in the" Humana Arbitration is *not* "identical with the one presented" in this action.[157]

## C. THE 2003 CONTRACT AND THE 2013 CONTRACT

The elements for a breach-of-contract claim under Delaware law are: "(1) the existence of a contractual obligation; (2) breach of that obligation; and (3) damages

---

[155] *In re Bracket Hldg. Corp. Litig.*, 2017 WL 3283169, at *6 (Del. Super. Ct. July 31, 2017) (citations omitted).

[156] *Chrysler Corp. v. New Castle Cnty.*, 464 A.2d 75, 82 (Del. Super. Ct. 1983); *Boone v. Oy Partek Ab*, 724 A.2d 1150, 1154 (Del. Super. Ct. 1997).

[157] *See Betts*, 765 A.2d at 535 (citation omitted).

-28-

resulting from the breach."[158] Delaware courts "adhere[] to the 'objective' theory of contracts, i.e.[,] a contract's construction should be that which would be understood by an objective, reasonable third party."[159] "When the contract is clear and unambiguous, [the Court] will give effect to the plain-meaning of the contract's terms and provisions."[160] But a contract is ambiguous when it is subject to multiple reasonable interpretations.[161] When a contract is ambiguous, that "rais[es] factual issues requiring consideration of extrinsic evidence to determine the intended meaning of the provision[s] in light of the expectations of the contracting parties."[162]

### 1. The 2003 Contract

Both parties move for summary judgment on breach of the 2003 Contract between Envolve and Rite Aid (Count II). Centene Plaintiffs contend Rite Aid did not accurately report its U&C price; in support thereof they point to two things. First, the National Council for Prescription Drug Programs ("NCPDP") sets industry standards for transmitting prescription-drug claims information, including U&C price; NCPDP defines U&C as the "[a]mount charged cash customers for the

---

[158] *Buck v. Viking Hldg. Mgmt. Co. LLC*, 2021 WL 673459, at *3 (Del. Super. Ct. Feb. 22, 2021) (citing *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003)).

[159] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (citing *NBC Universal v. Paxson Commc'ns*, 2005 WL 1038997, at *5 (Del. Ch. Apr. 29, 2005)).

[160] *Id.* at 1159-60 (citing *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992)).

[161] *Id.* at 1160.

[162] *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1229 (Del. 1997).

prescription exclusive of sales tax or other amounts claimed"; and the NCPDP standards govern the 2003 Contract.[163] Second, the Seventh Circuit in *United States ex rel. Garbe v. Kmart Corporation*[164] held that a pharmacy's U&C price must include discount prices that are widely and consistently available to uninsured cash customers unless those discount prices are expressly excluded from U&C by contract or law.[165] In Centene Plaintiffs' view, the 2003 Contract does not deviate from NCPDP standards or *Garbe*, and so Rite Aid had a duty to include Program or price-matched prices when reporting its U&C price to Envolve.[166] Centene Plaintiffs say that because Rite Aid excluded these prices, Rite Aid breached the 2003 Contract and Envolve suffered damages.[167]

Not so, counters Rite Aid. According to Rite Aid, the 2003 Contract's reimbursement lesser-of logic did not include U&C price.[168] As support, Rite Aid points out that while Centene Plaintiffs assert Rite Aid breached 2003 Contract

---

[163] *See* Pls.' Mot. for Summ. J. at 2, 31-32.

[164] 824 F.3d 632 (7th Cir. 2016).

[165] *See* Pls.' Mot. for Summ. J. at 3, 31-32.

[166] *See id.* at 32.

[167] *See id.* at 32-34, 38-39.

[168] *See* Defs.' Answering Br. at 29-30.

Sections 1.7 (definition of U&C) and 2.5 (claim submissions), the reimbursement payments are actually governed by Section 2.1 (lesser-of logic).[169]

At the outset, the plain words of the 2003 Contract control. Centene Plaintiffs focus on 2003 Contract Sections 1.7 and 2.5. But Centene Plaintiffs' breach claim is, at its core, based on reimbursements via the 2003 Contract's lesser-of logic.[170] And that's laid out in Section 2.1. Avoiding Section 2.1, Centene Plaintiffs ask the Court to look to the NCPDP standards and *Garbe*. But that's extrinsic evidence the Court cannot consider unless the contract terms are ambiguous.[171] In other words, "[e]xtrinsic evidence is not to be used to interpret contract language where that language is plain and clear on its face."[172]

Section 2.1's lesser-of logic language controls here and it's unambiguous. Section 2.1 states:

> The following pricing applies to the On-Lok Third Party Payor only:
> <u>Brand Name:</u> AWP [Average Wholesale Price] less 12% or MAC [Maximum Allowable Cost], whichever is less, plus a $0.95 dispensing

---

[169] *See* Defs.' Mot. for Summ. J. at 32 n.117; *see also* Pls.' Mot. for Summ. J., Ex. 1 §§ 1.7, 2.1, 2.5.

[170] *See* Pls.' Mot. for Summ. J. at 8 (contending that Rite Aid doesn't dispute the Envolve was reimbursing Rite Aid under a "'lesser of' U&C logic as of September 2008), 7 (noting that generally under a lesser-of logic, "a pharmacy is paid the lesser of a negotiated rate for the drug and the pharmacy's U&C price for that drug").

[171] *See Eagle Indus., Inc.*, 702 A.2d at 1232 ("If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity.").

[172] *O'Brien v. Progressive N. Ins. Co.*, 785 A.2d 281, 289 (Del. 2001) (internal quotation marks and citation omitted).

fee per 7-day supply. <u>Generic:</u> The lesser of AWP less 20% or MAC, whichever is less, plus a $0.95 dispensing fee per 7-day supply.[173]

U&C price is not included in this definition. U&C price also is not included in the 2007 amendment to Section 2.1.[174] The Court is bound by the plain meaning of an unambiguous contract. Centene Plaintiffs offer scads of extrinsic evidence and facts to suggest the parties' course of dealing did not follow the 2003 Contract.[175] Maybe so, but having before it an express breach-of-contract claim, the Court cannot consider this evidence when the operable language—that of Section 2.1—is unambiguous.[176]

Turning to Sections 1.7 and 2.5, neither saves Centene Plaintiffs. Section 1.7 defines U&C price as "[t]hose amounts which [Rite Aid] normally charges its private pay patients for comparable Pharmaceutical Services and as may be provided to Patient-Beneficiaries of a Third Party Payor, as provided herein."[177] But again, U&C

---

[173] Pls.' Mot. for Summ. J., Ex. 1 § 2.1 (underlining in original); Defs.' Mot. for Summ. J., Ex. 26 at Tr. 32:21-33:6; Defs.' Mot. for Summ. J., Ex. 25 at Tr. 94:15-95:2.

[174] Defs.' Answering Br., Ex. 3 § 2.1.

[175] *See, e.g.*, Pls.' Answering Br., Ex. 7 at Tr. 158:8-159:15 (acknowledging, as a Rite Aid representative, that Rite Aid was reimbursing Envolve under a lesser-of logic as of 2008, but noting that the 2003 Contract didn't reference U&C in the lesser-of logic, and noting that if Rite Aid reimbursed Envolve using U&C as part of lesser-of logic it wasn't "based on the written contract").

[176] *Cf. In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) ("When construing *ambiguous* contractual provisions, Delaware courts are permitted to consider the parties' course of dealing." (emphasis added) (citation omitted)).

[177] Pls.' Mot. for Summ. J., Ex. 1 § 1.7. "Patient-Beneficiaries" is defined, in relevant part, as: "Members and beneficiaries of members, who rely on a Third Party Payor . . . to purchase for them or reimburse them for the purchase of medical services or pharmaceutical products." *Id.*, Ex. 1 § 1.4. "Pharmaceutical Services" is defined, in relevant part, as: "The providing by Pharmacy of drugs and professional services to Patient-Beneficiaries enrolled in Third Party Payor programs .

price is not included in the contractual definition of the parties' lesser-of logic.[178]

Section 2.5, likewise, doesn't help Centene Plaintiffs. Centene Plaintiffs use this Section to suggest the U&C price must track the NCPDP definition because Section 2.5 contains the language, "where on-line communication is not possible, [Rite Aid] agrees to file claims in writing for payment using the industry standard [*i.e.*, NCPDP] Universal Claims Form."[179] The Court notes that simply because Section 2.5 references "industry standard," it does not follow that the otherwise contract-defined U&C price must track NCPDP standards. Sections 1.7 and 2.5 are separate and distinct provisions, and nothing in the 2003 Contract suggests Centene Plaintiffs' interpretation is reasonable.

As it relates to the June 2010 amendment to the 2003 Contract, it appears U&C is incorporated into the lesser-of logic. Specifically, the June 2010 amendment modified the definition of "Generic Effective Rate" or "GER."[180] The definition states that the GER is "expressed as a percentage reduction of the [AWP] as calculated quarterly including[, *inter alia*,] Usual and Customary Charge Claims, . . .

---

. . . Pharmaceutical Services includes the dispensing of any Generic Drug or Brand Name Drug, [among others]." *Id.*, Ex. 1 § 1.5. "Third Party Payor" is defined as: "Any entity which purchases or reimburses the purchase of medical services or pharmaceutical products and services on behalf of Patient-Beneficiaries. Such entities include, but are not limited to, insurance companies, union trusts, employers, medical care foundations, and preferred provider organizations." *Id.*, Ex. 1 § 1.6.

[178] *See id.*, Ex. 1 § 2.1.

[179] *See id.*, Ex. 1 § 2.5; *see also id.* at 31-32; Pls.' Reply Br. at 7-8.

[180] *See* Pls.' Reply Br., Ex. 8 § 6.

-33-

and multi-source Brand Name Drugs on the MAC list or . . . that price as Usual and Customary Charge Claims."[181] Section 2.1's lesser-of logic includes the AWP metric for generic drugs.[182] Accordingly, the June 2010 amendment incorporated U&C price into the lesser-of logic. But the parties dispute whether the Program prices and price-matched prices are included in the 2003 Contract's U&C language. U&C price is ambiguous as it relates to whether the Program and price-match are included within the definition. Neither party cites helpful extrinsic evidence on this point. Thus, there is a genuine issue of material fact.

Centene Plaintiffs have no bases to support their breach-of-contract claim under the unambiguous 2003 Contract from September 2008 (the start of the applicable time period) to June 2010. Rite Aid has carried its burden to prove there is no genuine issue of material fact on Count II for the September 2008 to June 2010 period. But from June 2010 through April 30, 2013 (the end of the 2003 Contract term), U&C price was included in the lesser-of logic. Even so, there is a genuine issue of material fact over whether the Program prices and price-matched prices were included in that U&C definition. Therefore, Centene Plaintiffs' claim for breach of the 2003 Contract is viable only for the period of June 2010 through the expiration

---

[181] *See id.*

[182] *See* Pls.' Mot. for Summ. J., Ex. 1 § 2.1

of the 2003 Contract (*i.e.*, April 30, 2013).  The Court **DENIES** summary judgment for both parties on Count II.

### 2.  The 2013 Contract

Both parties moved for summary judgment on breach of the 2013 Contract between Rite Aid and Envolve (Count IV).  Centene Plaintiffs contend Rite Aid did not accurately report its U&C price on claim submissions to Envolve.[183] Specifically, Centene Plaintiffs argue the 2013 Contract did not permit Rite Aid to exclude its Program and price-matched prices from its U&C submissions.[184] Centene Plaintiffs break down the 2013 Contract's definition of U&C price and allege:  Rite Aid had a duty to report accurately; Rite Aid breached this duty; and Envolve suffered damages as a result of the breach.[185]  Centene Plaintiffs also argue the Program was not a contract between customers and Rite Aid[186]—that is an important key for analyzing the definition of U&C.

Rite Aid contends the definition of U&C price in the 2013 Contract encompasses neither the Program prices nor the price-matched prices.[187] Specifically, Rite Aid insists that the language "non-contracted" in the U&C

---

[183] *See id.* at 35.

[184] *See id.*

[185] *See id.* at 35-39.

[186] *See* Pls.' Answering Br. at 33-34.

[187] Defs.' Mot. for Summ. J. at 33.

definition was intended to exclude Program prices and other discounts from U&C because the Program was a contract between Rite Aid and Program members.[188]

Again, as a starting point, the plain words of the 2013 Contract control. In the 2013 Contract, "Usual and Customary" is defined as "the lowest price [Rite Aid] would charge to a non-contracted, cash-paying customer with no insurance for an identical Pharmaceutical Service on the date and at the location that the product is dispensed, inclusive of all applicable discounts, promotions, or other offers to attract customers."[189]

### a. The Program was a contract. The price-matching policy was not. The price-matching policy was a promotion, discount or other offer to attract customers.

The first issue is whether members who signed up for the Program were "contracted." They were. "The elements necessary to prove the existence of an enforceable contract are: (1) the intent of the parties to be bound, (2) sufficiently definite terms, and (3) consideration."[190] Among these, the parties most hotly contest whether there was consideration. There was.

Rite Aid says there was consideration because "Program members offered their personal information to Rite Aid and granted Rite Aid permission to share it

---

[188] *See id.* at 33-36.

[189] Pls.' Mot. for Summ. J., Ex. 2 § 1(U).

[190] *Otto v. Gore*, 45 A.3d 120, 138 (Del. 2012) (citation omitted).

with ScriptSave in exchange for access to Program discounts."[191] Centene Plaintiffs say there was no recognizable consideration.[192] Not so. Consideration is "a benefit to a promisor or a detriment to a promisee pursuant to the promisor's request."[193] As a general principle, "money is not the only acceptable form of consideration."[194] With respect to the Program, prospective Program members provided Rite Aid with personal information in exchange for the right to receive discounted prescription drug prices.[195] No doubt there is a growing trend among courts to recognize the value of personally identifiable information.[196] With regard to the Program, the

---

[191] Defs.' Answering Br. at 39-40.

[192] Pls.' Mot. for Summ. J. at 36-37.

[193] *Cigna Health & Life Ins. Co. v. Audax Health Sols., Inc.*, 107 A.3d 1082, 1088 (Del. Ch. 2014) (cleaned up) (citation omitted).

[194] *Hennegan v. Cardiology Consultants, P.A.*, 2008 WL 4152678, at *1 (Del. Super. Ct. Sept. 9, 2008); *see also Cox Commc'ns, Inc. v. T-Mobile US, Inc.*, 273 A.3d 752, 764 (Del. 2022) ("Consideration requires that each party to a contract convey a benefit or incur a legal detriment, such that the exchange is bargained for. If this requirement is met, there is no additional requirement of equivalence in the values exchanged." (cleaned up) (citations omitted)); *Cox Commc'ns, Inc.*, 273 A.3d at 764 (explaining that the Court limits its consideration inquiry to whether it exists and "not whether it is fair or adequate" (internal quotation marks and citation omitted)).

[195] *See* Pls.' Mot. for Summ. J. at 13-14. This information included "name, address, phone number, email address, birth date, and dependent information." Defs.' Answering Br. at 38-39.

[196] *See, e.g.*, *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge – the value that personal identifying information has in our increasingly digital economy. Many companies . . . collect personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services."); *In re Capital One Consumer Data Sec. Breach Litig.*, 488 F. Supp. 3d 374, 412 (E.D. Va. 2020) (noting the plaintiffs in that case delivered personally identifiable information to defendants "in consideration for receiving credit services"). Additionally, other comparable programs create binding contracts between a company and a customer. *See, e.g.*, *Gordon v. United Cont'l Hldg., Inc.*, 73 F. Supp. 3d 472, 475, 478 (D.N.J. 2014) (stating that a frequent flyer program provided by the defendant created a contract

Court views this personally identifiable information as sufficient consideration to create a valid contract.[197] Those customers enrolled in the Program were indeed "contracted."

But the price-matching policy is not a contract. The price-matching policy permitted any customer on any given visit to provide a Rite Aid pharmacist with a competitor's verified price.[198] Then the pharmacist handling the individual transaction could match the competitor's price.[199] The price-matching policy was widely advertised.[200] "An offer is the 'signification by one person to another of his willingness to enter into a contract with him on the terms specified in the offer.'"[201]

---

between each plaintiff and the defendant (the parties agreed there was a contract) where members could enroll for the frequent flyer program by acknowledging and agreeing to a set of rules); *Hongbo Han v. United Cont'l Hldg., Inc.*, 762 F.3d 598, 601 (7th Cir. 2014) (acknowledging that the same frequent flyer program in *Gordon*, *supra*, created a contract and holding the plaintiff could not state a claim for breach of contract because defendant's interpretation of that contract was reasonable); *Hennessey v. Kohl's Corp.*, 571 F. Supp. 3d 1060, 1071 (E.D. Mo. 2021) (finding consideration existed where the plaintiff created an online account with defendant and received website benefits such as express check-out, saved billing and shipping information, and review of pending and past online orders; such benefits constituting consideration).

[197] "A valid contract requires and offer, acceptance, and consideration." *Trexler v. Billingsley*, 2017 WL 2665059, at *3 (Del. June 21, 2017) (citation omitted). Centene Plaintiffs additionally argue there can be no contract because customers could enroll family members (or pets) without those family members signing or being present. Pls.' Mot. for Summ. J. at 14. But this does not change the end result. There was an offer to enter into the Program for discounted drug prices. Prospective customers accepted the offer by signing up for the Program. And there was consideration in the form of providing personally identifiable demographic information.

[198] Defs.' Answering Br. at 12.

[199] Defs.' Mot. for Summ. J. at 25 n.92.

[200] *See* Pls.' Mot. for Summ. J. at 16-17.

[201] *Hyetts Corner, LLC v. New Castle Cnty.*, 2021 WL 4166703, at *7 (Del. Ch. Sept. 14, 2021) (quoting *Loveman v. Nusmile, Inc.*, 2009 WL 847655, at *3 (Del. Super. Ct. Mar. 31, 2009)).

"But a 'mere statement of a person's willingness to enter negotiations with another person is in no sense an offer, and cannot be accepted so as to form a binding contract.'"[202] The price-matching policy was a statement of Rite Aid's "willingness to enter negotiations with" a prospective customer.[203] Thus, it "cannot be accepted so as to form a binding contract."[204]

Now, the price-matching policy was a promotion or discount. "Promotion" is defined as "the act of furthering the growth or development of something *especially*: the furtherance of the acceptance and sale of merchandise through advertising, publicity, or discounting."[205] "Discount" is "a reduction from the full amount or value of something."[206] The price-matching policy was a promotion because the goal was to further the "sale of [prescription drugs] through advertising, publicity, or discounting."[207] This is highlighted by the facts that the price-match was widely advertised, and it offered discounted prices to attract customers.[208] The price-

---

[202] *Id.* (quoting *Salisbury v. Credit Serv., Inc.*, 199 A. 674, 681 (Del. Super. Ct. 1937)).

[203] *See id.* (internal quotations omitted).

[204] *See id.* (internal quotations omitted).

[205] *Promotion*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/promotion (last visited Mar. 16, 2023) (emphasis in original).

[206] *Discount*, BLACK'S LAW DICTIONARY (11th ed. 2019). Merriam-Webster defines "discount" as "a reduction made from the gross amount or value of something: such as a reduction made from a regular or list price." *Discount*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/discount (last visited Mar. 16, 2023).

[207] *See Promotion*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/promotion (last visited Mar. 16, 2023).

[208] *See* Pls.' Mot. for Summ. J. at 16-17.

matching policy was also a discount because it reduced the full amount a customer would pay for a given prescription drug to a markdown price.[209] In other words, when a customer entered Rite Aid with a verified lower price from a competitor, a Rite Aid pharmacist could choose to match that lower price. Thus, the price-matching policy was a promotion or discount.

At bottom, the term "non-contracted" in the 2013 Contract is unambiguous because it's susceptible to only one reasonable interpretation.[210] And U&C encompasses only those customers who, *inter alia*, did not enter into a contract with Rite Aid for prescription drugs. Additionally, the language that states "inclusive of all applicable discounts, promotions, or other offers to attract customers" is unambiguous. That is, for the purposes of this action, the price-matching policy is a discount or promotion.

So, the Program is a contract and therefore falls outside the 2013 Contract's U&C definition. The Program prices therefore cannot fall within the Centene Plaintiffs' breach of the 2013 Contract claim. The price-matching policy though is

---

[209] *See Discount*, BLACK'S LAW DICTIONARY (11th ed. 2019); *see also* Defs.' Answering Br. at 12; Defs.' Mot. for Summ. J. at 25 n.92.

[210] *Cf. Osborn*, 991 A.2d at 1160 (noting that a contract is ambiguous when it is "reasonably ascrib[able] [to] multiple and different interpretations"). Even if the Court determined that "non-contracted" is ambiguous, Rite Aid produces certain testimony from Dianne Mason, who negotiated the 2013 contract. *See* Defs.' Mot. for Summ. J. at 34. Ms. Mason testified "non-contracted" was included in the 2013 Contract with the intent to exclude the Program and other discount programs on the market from the U&C definition. *See id.*

not a contract but is a promotion or discount. The price-matched prices therefore can support Centene Plaintiffs' breach of the 2013 Contract claim.

### b. There remains a genuine factual issue as to whether price-matching customers are "cash-paying" customers.

Centene Plaintiffs contend the price-match customers were cash-paying customers. They take the literal approach to the U&C definition, arguing price-match customers were solely responsible for their purchase and therefore were cash-paying customers.[211] Centene Plaintiffs also point to: (1) a July 2008 Rite Aid Pharmacy Operations Bulletin that states price-match customers "should be treated as cash";[212] (2) Rite Aid's former CFO who stated that he "believe[d] [price-matching] would have been a cash claim";[213] and (3) a former Rite Aid executive who stated that price-matched sales were "cash prescriptions."[214] Thus, Centene Plaintiffs conclude price-match customers fall within the "cash-paying customer" language of the U&C definition.

Rite Aid contends the price-match customers were not "cash-paying" customers as defined by the U&C.[215] Rite Aid points to an expert report by William

---

[211] *See* Pls.' Mot. for Summ. J. at 14.

[212] *Id.*, Ex. 31.

[213] *Id.*, Ex. 6 at Tr. 86:20-87:1.

[214] *Id.*, Ex. 10 at Tr. 60:22-61:2.

[215] *See* Defs.' Answering Br. at 12.

Wolfe.[216] Mr. Wolfe stated that price-matching was an "episodic practice, premised on a very clear policy around individual patient request[s] and other terms," and that "[i]t is nonsensical to suggest price matching would be factored into retail prices that are reported as U&C."[217] Mr. Wolfe also stated price-matched prices could not be U&C because there was no mechanism to identify when a pharmacist matched a price.[218]

"When the contract is clear and unambiguous, [the Court] will give effect to the plain-meaning of the contract's terms and provisions."[219] But a contract is ambiguous when it is subject to multiple reasonable interpretations.[220] When a contract is ambiguous, that "rais[es] factual issues requiring consideration of extrinsic evidence to determine the intended meaning of the provision[s] in light of the expectations of the contracting parties."[221]

The Court holds the "cash-paying customers" language of the 2013 Contract's U&C definition is ambiguous. This term is subject to multiple reasonable interpretations.[222] Both parties cite extrinsic evidence to suggest their respective

---

[216] *See id.*; *see also id.*, Ex. 34.

[217] *Id.*, Ex. 34 ¶ 6.

[218] *Id.*, Ex. 30 at Tr. 137-38; *id.*, Ex. 30 at Tr. 162.

[219] *Osborn*, 991 A.2d at 1159-60 (citing *Rhone-Poulenc Basic Chems. Co.*, 616 A.2d at 1195).

[220] *Id.* at 1160.

[221] *Eagle Indus., Inc.*, 702 A.2d at 1229.

[222] *Osborn*, 991 A.2d at 1160.

interpretations are correct. There is a genuine issue of material fact over whether price-match customers are "cash-paying customers" and whether they fall within the 2013 Contract's U&C definition. This issue must be resolved by the trier of fact.

The Court therefore **DENIES** summary judgment for both parties on Count IV.

### D. THE CAREMARK CONTRACT AND THE ARGUS CONTRACT

Recall, the Court earlier decided Rite Aid's motion to dismiss. On Count VI (unjust enrichment), the Court partially dismissed that count with respect to Envolve.[223] But the Court held that Count VI survived with respect to the Health Plans, who were not parties to the contracts and who were determined to not be third-party beneficiaries either.[224] Thus, Count VI survived with respect to the Health Plans, and Rite Aid now moves for summary judgment on that remainder.

"Unjust enrichment is 'the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience.'"[225] "The elements of unjust enrichment are: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy

---

[223] *See* Mem. Op. at 26.

[224] *See id.* at 26-27.

[225] *Frederick Hsu Living Tr. v. ODN Hldg. Corp.*, 2017 WL 1437308, at *42 (Del. Ch. Apr. 14, 2017) (quoting *Fleer Corp. v. Topps Chewing Gum, Inc.*, 539 A.2d 1060, 1062 (Del. 1988)).

provided by law."[226]  The last element—the absence of a remedy provided at law—is jurisdictional.[227]  Where the plaintiff seeks only money "damages to correct an unjust enrichment, jurisdiction lies in [this] Court even though the claim is fundamentally an equitable one."[228]

### 1. The Caremark Contract

Rite Aid moves for summary judgment on Count VI regarding the Caremark Contract.  Rite Aid argues the Caremark Contract's U&C price was not required to include Program prices.[229]  It does not appear clear whether Rite Aid believes this to be true based on the Caremark Contract's clear language or not.  Rite Aid devotes most of its argument to course of dealing and other extrinsic evidence.[230]  Rite Aid additionally believes price-matched prices were not part of U&C.[231]

Centene Plaintiffs contend the plain language of the Caremark Contract's U&C definition included Rite Aid's Program prices and price-matched prices because the definition contains "no carve-outs for discounts."[232]  Centene Plaintiffs

---

[226] *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010) (citation omitted).

[227] *See St. Search P'rs, L.P. v. Ricon Int'l, L.L.C.*, 2005 WL 1953094, at *3 (Del. Super. Ct. Aug. 1, 2005).

[228] *Id.*

[229] *See* Defs.' Mot. for Summ. J. at 26.

[230] *See id.* at 26-30 (discussing testimony from Caremark personnel and discussing other Caremark contracts).

[231] *See* Defs.' Answering Br. at 12-13; *see also id.*, Ex. 34.

[232] *See* Pls.' Answering Br. at 26.

argue the language is clear on its face, and even if the Court finds otherwise and looks to extrinsic evidence, "the record contains significant facts showing that both Caremark and Rite Aid understood that the [Caremark] Contract *included* Rite Aid's [Program] prices in its definition of U&C."[233]

The Caremark Contract defines U&C as "the lowest price [Rite Aid] would charge to a particular customer if such customer were paying cash for an identical prescription on that particular day. This price must include any applicable discounts offered to attract customers."[234] In 2019, Rite Aid and Caremark amended the U&C price definition. That amended definition reads U&C price "shall exclude third party cash discount card networks and/or other discount programs that require program enrollment."[235]

At the outset, the language of the Caremark Contract controls. Initially, the Caremark Contract's language appears ambiguous. But there is similarity between "cash paying customer" and "customer . . . paying cash" in the 2013 Contract and the Caremark Contract, respectively. As noted above, "cash paying customer" is ambiguous with respect to the price-matching policy.[236] Equally here, the Court finds that the "customer . . . paying cash" language in the Caremark Contract is

---

[233] *Id.* at 27 (emphasis in original).

[234] Defs.' Mot. for Summ. J., Ex. 1 at Schedule of Terms.

[235] *Id.*, Ex. 18 § 13(f).

[236] *See supra* Part V.c.2.b.

-45-

ambiguous with respect to the price-matching policy. The Court thus looks to extrinsic evidence.[237]

The extrinsic evidence mentioned in the 2013 Contract's discussion, *supra*, is of equal weight here.[238] Like with the 2013 Contract, the Court finds that the "customer . . . paying cash" language of the Caremark Contract is ambiguous and both sides present competing extrinsic evidence. But the Court notes the price-matching policy, as discussed *supra*, is an "applicable discount[] offered to attract customers."[239] So Rite Aid has not carried its burden to show its interpretation with respect to the price-matching policy is the only reasonable interpretation under the Caremark Contract's language.

Next, Rite Aid says Program prices were never included in the U&C definition.[240] Rite Aid cites to an affidavit by a Caremark Senior Vice President.[241] Centene Plaintiffs say the Program prices were included in the U&C definition.[242] Centene Plaintiffs cite to: (1) a 2008 email allegedly showing Caremark understood

---

[237] *See Osborn*, 991 A.2d at 1160 (noting a contract is ambiguous when it is subject to multiple reasonable interpretations).

[238] *See supra* Part V.C.2.b.

[239] Defs.' Mot. for Summ. J., Ex. 1 at Schedule of Terms; *see also supra* Part V.C.2.a.

[240] *See* Defs.' Mot. for Summ. J. at 26-29.

[241] *See id.* at 26; *see also id.*, Ex. 39 ¶¶ 17, 26.

[242] *See* Pls.' Answering Br. at 27-30.

the Program to be Rite Aid's "new U&C";[243] (2) the 2019 amendment to the Caremark Contract that explicitly excluded "third party cash discount card networks and/or other discount programs that require program enrollment";[244] among other statements made by Caremark and Rite Aid personnel.[245]

The Court notes that the "customer . . . paying cash" language is ambiguous with respect to the Program. First, one healthcare consulting expert with decades of experience opined that "NCPDP has never defined 'cash customers' to mean *every customer not using insurance to purchase his or her prescription*," and that NCPDP distinguishes between "some self-pay customers who pay 'cash' and other self-pay customers who use a 'discount program.'"[246] Second, Rite Aid cites an affidavit by a Caremark Senior Vice President who stated Rite Aid was not required or expected to report Program prices as U&C.[247] Third, Centene Plaintiffs cite a 2008 email from a "CVS Caremark executive" who stated the Program is Rite Aid's new U&C.[248] Thus, there is a genuine issue of material fact regarding whether the Program should

---

[243] *See id.* at 27-28; *see also id.*, Ex. 22.

[244] *See id.* at 28-29; *see also* Defs.' Mot. for Summ. J., Ex. 18 § 13(f).

[245] *See* Pls.' Answering Br. at 28-30; *see also id.*, Exs. 29-30, 26, 18-20.

[246] *See* Defs.' Answering Br., Ex. 32 ¶¶ 66-69 (emphasis in original).

[247] *See* Defs.' Mot. for Summ. J., Ex. 39 ¶¶ 17, 26.

[248] *See* Pls.' Answering Br., Ex. 22.

have been incorporated into Rite Aid's U&C for the Caremark Contract. Rite Aid has failed to carry its burden; the issue must be resolved by the trier of fact.

So, summary judgment is **DENIED** on Count VI regarding the price-matching policy and the Program with respect to the Caremark Contract.

### 2. The Argus Contract

Rite Aid moves for summary judgment on Count VI regarding the Argus Contract. The Argus Contract defines U&C price as "the lowest price [Rite Aid] would charge to a cash paying, **non-contracted** customer for an identical prescription on the date and at the location that the prescription is dispensed, including any special promotions or discounts available to the public on such date of dispensing."[249] In 2018, Rite Aid and Argus amended the definition of U&C price. The amended definition states the U&C price "shall exclude cash discount card networks and/or other discount programs that require enrollment."[250]

Up to this point, the Court has established: (1) the Program is a contract; (2) the price-matching policy is not a contract; (3) the price-matching policy is a discount or promotion; and (4) that "cash-paying customer" language in these contracts is ambiguous with both parties offering competing extrinsic evidence on their respective interpretations.

---

[249] Defs.' Mot. for Summ. J., Ex. 5 at Ex. 1 § 1.40 (emphasis in original).

[250] Pls.' Answering Br., Ex. 13 § 4(b).

-48-

In light of the above findings, the Court finds, with regard to the Argus Contract, that: (1) Program prices are excluded from the Argus Contract's U&C definition; (2) the price-matching policy falls within the "non-contracted" language of the Argus Contract's U&C definition; (3) the price-matching policy also falls within the "special promotions or discounts" language of the Argus Contract's U&C definition; and (4) there is a genuine issue of material fact regarding whether the price-match customers fall within the "cash paying customers" language of the Argus Contract's U&C definition. Accordingly, as it relates to the price-match customers, the trier of fact—which at this stage, the Court is not—must determine whether these customers were "cash paying customers" and whether price-matched prices should have been included in Rite Aid's U&C for the Argus Contract.

Rite Aid's Motion for Summary Judgment on Count VI with respect to the Argus Contract is **DENIED**.

## V. CONCLUSION

For the foregoing reasons, with respect to Count II (breach of the 2003 Contract), both parties' Motions for Summary Judgment are **DENIED**. With respect to Count IV (breach of the 2013 Contract), both parties' Motions for Summary Judgment are **DENIED**. With respect to Count VI (unjust enrichment under the

Caremark Contract and the Argus Contract), Rite Aid's Motion for Summary Judgment is **DENIED**.[251]

      **IT IS SO ORDERED**.

_(signature)_
_____
Paul R. Wallace, Judge

---

[251] Rite Aid's two remaining arguments—that Centene Plaintiffs can't prove damages and that the voluntary payment doctrine defeats Centene Plaintiffs' claims—fail. First, Rite Aid argues Centene Plaintiffs can't prove damages because their expert's report allegedly omits important metrics. *See* Defs.' Mot. for Summ. J. at 36-37. Centene Plaintiffs counter that "Rite Aid seeks to turn a dispute over how to calculate damages into a finding that no damages occurred." *See* Pls.' Answering Br. at 36. Centene Plaintiffs are correct. On summary judgment, there must be "some credible evidence . . . that supports a claim for damages." *Torrent Pharma, Inc. v. Priority Healthcare Distrib., Inc.*, 2022 WL 3272421, at *13 (Del. Super. Ct. Aug. 11, 2022) (internal quotation marks and citation omitted). If Centene Plaintiffs are able to prove the other elements of their remaining claims, damages will be established based on the facts of this case. Simply put, this is a case about overpayments. If Centene Plaintiffs overpaid, they will be entitled to damages. Thus, Rite Aid's motion for summary judgment on this ground is denied.

    Second, Rite Aid argues the voluntary payment doctrine defeats Centene Plaintiffs' claims. Not so. "The voluntary payment doctrine bars recovery of payment voluntarily made with full knowledge of the facts." *Intermec IP Corp.*, 2021 WL 3620435, at *15 (internal quotation marks and citation omitted). Moreover, when money is paid under a mistake of fact, as opposed to a mistake of law, "the payment may be excused and recovery [is] possible." *See id.* (citation omitted). As stated in the statute of limitations discussion, *supra*, there is a genuine issue of material fact as to whether Centene Plaintiffs were on any notice that Rite Aid did not include Program prices and other discount prices in its U&C metric and its lesser-of logic. Rite Aid has not carried its burden to show Centene Plaintiffs had "full knowledge of the facts." Rite Aid's motion for summary judgment on this ground is denied.